IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| MARK BREAKIRON, | ) | |
|---|---|---|
| Petitioner, | ) | Civil Action No. 2:14-570 |
| | ) | |
| v. | ) | District Judge Nora Barry Fischer |
| | ) | |
| JOHN E. WETZEL, et al., | ) | |
| Respondents. | ) | |

## **OPINION**

Pending before the Court is the pre-trial petition for a writ of habeas filed by Mark Breakiron pursuant to 28 U.S.C. § 2241. He contends that his double jeopardy and due process rights bar his retrial for murder and robbery in the Court of Common Pleas of Fayette County. The Magistrate Judge to whom the case was referred issued a Report and Recommendation ("R&R") in which it was recommended that the petition be dismissed for lack of merit and that a certificate of appealability be denied. ECF No. 13. Breakiron has filed objections, ECF No. 17, to the R&R in which he argues, *inter alia*, that the Magistrate Judge incorrectly applied the standard of review applicable to post-judgment habeas petitions filed pursuant to 28 U.S.C. § 2254.

Where, as here, objections have been filed, the Court is required to make a *de novo* determination as to those portions of the R&R to which objections were made. See 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b). Accordingly, the Court has carefully examined *de novo* all arguments raised by Breakiron in his objections. The Court agrees with the Magistrate Judge's ultimate conclusion that Breakiron is not entitled to habeas relief or a certificate of appealability. However, because Respondents do not dispute that § 2254(d)'s standard of review does not apply to this case, the Court declines to adopt the R&R as the Opinion of the Court. For the reasons set

1

forth below, and after an independent review of all of the parties' submissions in this case, Breakiron's request for habeas relief is denied.

**I.      Background**

In 1987, Breakiron killed Saundra Marie Martin. She worked at Shenanigans' Lounge and Breakiron stabbed and beat her when the two of them were the last people remaining at the bar during the early morning hours of March 24, 1987. Breakiron v. Horn, No. 00-cv-300, 2008 WL 4412057, *2 (W.D. Pa. 2008).

Breakiron's trial was held in April 1988 in the Court of Common Pleas of Fayette County. Judge William J. Franks presided over the trial. Mark F. Morrison, Esq., then the Acting District Attorney of Fayette County, and Cynthia M. Cline, Esq., Assistant District Attorney, prosecuted the case.

The Commonwealth presented the testimony of Dr. Manuel Pelaez, the pathologist who performed the autopsy, to show that Breakiron had inflicted brutal injuries upon Martin. Dr. Pelaez testified at length as to the nature of the severe injuries that Martin had sustained to her head, neck, trunk, and extremities. He stated that the cause of Martin's death was internal and external bleeding secondary to multiple stab wounds, and that blunt force injuries to her head contributed to her death. Dr. Pelaez also stated that there were numerous cuts and slashes on both of Martin's hands, which he described as defensive wounds that indicated that she had attempted to protect herself with her hands. Id. at *3.

The Commonwealth also presented the testimony of Ellis Price, who had been incarcerated with Breakiron in the Fayette County Jail in the summer of 1987. Ellis Price testified that Breakiron told him that he hid in the bathroom of Sheningans' Lounge and waited

for the remaining patrons to leave before coming back out. He said that Breakiron told him that when Martin stated that the bar was closing and he had to leave, he picked up an ashtray and started hitting her and then pulled out a knife and stabbed her. Ellis Price testified that he did not have any "deals" with the Commonwealth for favorable treatment in exchange for his testimony. He denied receiving any benefit in exchange for his testimony. He also described the crime for which he was convicted in Michigan as "assault." Id.

Breakiron testified in his own defense. He admitted that he killed Martin. His defense to the murder charge was that he was too intoxicated to form the specific intent to kill and that he was guilty of third-degree murder, not first-degree murder. Id. The jury rejected Breakiron's defense and convicted him of first-degree murder and robbery. It sentenced him to death on the first-degree murder conviction. Id. at *6.

Many years later, Breakiron filed with this Court a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. That case was docketed as Breakiron v. Horn, No. 2:00-cv- 300 (W.D. Pa.). In it, Breakiron contended, *inter alia*, that the prosecution failed to disclose evidence that would have impeached Ellis Price's testimony in violation of its obligations under Brady v. Maryland, 373 U.S. 83 (1963). Specifically, Breakiron argued that Ellis Price had a substantial motivation to testify in favor of the prosecution and that the prosecution failed to disclose evidence of his possible bias. In support of this claim, Breakiron explained that Ellis Price (who was serving a sentence imposed by the State of Michigan), was brought to Fayette County in 1986 to face numerous felony charges, including attempted murder, in a case involving victims Raymond Ricker and Richard Pletcher (the "Ricker/Pletcher case"). In October 1986, a jury found Ellis Price guilty of attempted homicide and related crimes in the Ricker/Pletcher case. On July 28, 1987, Judge Franks granted him an arrest in judgment and overturned his convictions.

3

The Commonwealth had thirty days in which to file an appeal of that order. On August 4, 1987, Ellis Price was interviewed by then Trooper Gary Brownfield, who was investigating Martin's homicide. During that interview, Ellis Price reported Breakiron's confession. The Commonwealth did not appeal Judge Franks's order reversing Ellis Price's convictions in the Ricker/Pletcher case. Findings of Fact at 4, ECF No. 171 in Breakiron v. Horn, No. 2:00-cv-300 (W.D. Pa. Sept. 19, 2007). Breakiron contended the Commonwealth did not appeal in consideration for Ellis Price's cooperation in Breakiron's criminal case.

Breakiron later amended his habeas petition and explained that James "Silky" Sullivan, an inmate that had been incarcerated in the summer of 1987 in the Fayette County Jail with Breakiron and Ellis Price, had recently revealed that he, Ellis Price, and another inmate, Conrad Blair, "invented" Breakiron's confession and wrote a letter to then District Attorney Gerald Solomon offering to testify against Breakiron in exchange for benefits in their respective cases. Breakiron alleged that the letter those inmates wrote was never turned over to the defense. He asserted that prior to his trial, Ellis Price had informed his brother Robert Price that Ellis's cooperation in the Breakiron case would get him (Robert) five years off the sentence he was serving. (Robert Price was a co-defendant in the Ricker/Pletcher case and was serving a term of imprisonment for his convictions in that case). Id. at 6.

Breakiron also supplemented his habeas petition to incorporate allegations involving the assault and robbery of Vincent Sterbutzel (the "Sterbutzel case"). He alleged that at the time Ellis Price first offered his information to the Commonwealth and at the time he testified at the trial, he was a suspect in the ongoing investigation of the Sterbutzel case. Ellis Price was never charged with any crimes in the Sterbutzel case and the other suspects in the case – his brothers Robert and Kevin Price and another individual named Mark DiMatteo – were all successfully

4

prosecuted for crimes against Sterbutzel. Breakiron contended that the Commonwealth's decision not to prosecute Ellis Price in the Sterbutzel case was in exchange for his cooperation in the Breakiron prosecution. He further alleged that the Commonwealth did not disclose to Breakiron's defense counsel that Ellis Price was a suspect in that Sterbutzel case. Id. at 8.

The Court held an evidentiary hearing on February 2, 2007. At the hearing, Breakiron called James Sullivan and Chris Owen Miller (another inmate incarcerated with Breakiron prior to his trial). He also called Robert Price (Ellis's brother). The Commonwealth called Ellis Price. It also presented the testimony of four former Fayette County District Attorneys: Morrison, who prosecuted Breakiron's case; Judge Gerald Solomon, who was the District Attorney at that time of Ellis Price's trial in the Ricker/Pletcher case; Judge Ralph Warman, the former Assistant District Attorney, who prosecuted the Price brothers in the Ricker/Pletcher case; and, Alphonse Lepore, Esq., the District Attorney in 1988-89 when charges were brought in the Sterbutzal case. Additionally, the Commonwealth called Sheriff Brownfield, who in his former employment with the State Police was the primary investigator of Martin's homicide; Earl Roberts, an investigator in the Ricker/Pletcher case and the Breakiron case; and Greg Kerpchar, an investigator who interviewed James Sullivan in 2005. Id. at 8-9.

Following the evidentiary hearing, the Court issued these Findings of Fact:

    1. In or around the summer of 1987, Sullivan, Ellis Price and Breakiron were incarcerated in the Fayette County Jail and housed in the same range.

    2. In or around the summer of 1987, Sullivan and Ellis Price wrote a letter to then District Attorney Solomon in which they offered information in the Breakiron case in exchange for benefits in their respective criminal cases. Around that same time, Ellis Price also sent his own letter to then District Attorney Solomon. In addition to seeking benefits for himself, Ellis Price also sought a reduction in the sentence that his brother Robert Price was serving for his convictions in the Ricker/Pletcher case.

5

3. Morrison was Sullivan's defense attorney during this time period and at some point prior to Breakiron's trial he learned that Sullivan had attempted to make a deal with the District Attorney's Office in exchange for benefits in his case.

4. Solomon, Warman, and Morrison do not recall seeing the letters that Sullivan and Ellis Price sent to the District Attorney's Office.

5. Representatives of the Commonwealth were aware that Ellis Price had offered information in the Breakiron case. Trooper Brownfield interviewed Ellis Price on August 4, 1987 in the Fayette County Jail "after [he] had learned that [Ellis Price] had possible information concerning [the Martin's homicide]." And, by the fall of 1987, then District Attorney Solomon had become aware that that Ellis Price was offering information in the Breakiron case.

6. Around the same time that Ellis Price sent the letters to then District Attorney Solomon, he was seeking post-trial relief from his October 1986 convictions in the Ricker/Pletcher case. He was also a suspect in the Sterbutzel case, along with his brothers Kevin and Robert, and Mark DiMatteo.

7. On or around July 28, 1987, Judge Franks issued an order granting Ellis Price's motion in arrest of judgment and reversing his convictions in the Ricker/Pletcher case.

8. On August 4, 1987, then Trooper Brownfield interviewed Ellis Price in the Fayette County Jail in order to investigate information Ellis Price possessed regarding the Breakiron case. Trooper Brownfield did not make any agreement with Ellis Price, express or implied, that he would receive benefits in exchange for information and testimony against Breakiron.

9. The Commonwealth did not appeal Judge Franks's order reversing Ellis Price's convictions in the Ricker/Pletcher case and therefore that decision became final on or around thirty days after the July 28, 1987 date of issuance. Warman's explanation as to why the Commonwealth decided not to appeal Judge Franks's decision is credible.[1] The Commonwealth's decision not to appeal Judge Franks's

---

[1] Warman testified that the District Attorney's Office did not appeal Judge Franks's decision because:

[W]e had a small office to begin with. We – I think we had five assistants back then. Everybody was part-time. The District Attorney was part-time. And we just – we didn't have the manpower. We didn't file any appeals. There might have been one appeal we filed in the ten years or so there. We were, generally, satisfied with what our judges did. They always gave us a decent shake.

Breakiron, No. 00-cv-300, 2008 WL 4412057 at *26 (quoting N.T. 2/2/07 at 155).

6

decision was based upon considerations that were not related to Ellis Price's involvement in the Breakiron case.

10. Robert Price was sentenced to ten to twenty years for his convictions in the Ricker/Pletcher case. (Id. at 69). He was released from imprisonment after serving twelve years of that sentence. (Id.)

11. No representative of the Commonwealth promised Ellis Price any relief for either him or his brother, Robert Price, in the Ricker/Pletcher case in exchange for information against Breakiron or for his testimony in the Breakiron trial. There was no express or implied agreement between Ellis Price and the Commonwealth that he would obtain any benefit in the Ricker/Pletcher case, or that his brother Robert Price would obtain any benefit in that case, in exchange for his participation in the Breakiron case. Neither Ellis Price nor Robert Price received any benefit in the Ricker/Pletcher case as a result of his participation in the Breakiron case.

12. The Commonwealth did not charge Ellis Price with any crime in the Sterbutzel case. In March 1989, then District Attorney Alphonse Lepore decided not to prosecute Ellis Price in the Sterbutzel case because he was "serving a long sentence in the State of Michigan." Lepore's decision was based upon considerations that were not related to Ellis Price's involvement in the Breakiron case.

13. In February 1988, DiMatteo was arrested for crimes against Sterbutzel, and in December 1988 he pleaded guilty to theft by unlawful taking and was sentenced to two years' probation and a fine. Kevin Price and Robert Price were arrested for crimes against Sterbutzel in February and March of 1989, respectively. In September 1989, Robert Price pleaded *nolo contendere* and was sentenced to serve five to ten years concurrent with the sentence he was serving in the Ricker/Pletcher case. In February 1990, Kevin Price was found guilty of robbery, theft by unlawful taking, and criminal conspiracy and was sentenced to serve six to twenty years imprisonment.

14. No representative from the Commonwealth promised Ellis Price any benefit with regard to the Sterbutzel case in exchange for information against Breakiron or for his testimony in the Breakiron case. There was no express or implied agreement between Ellis Price and the Commonwealth that he would obtain any benefit in the Sterbutzel case in exchange for his participation in the Breakiron case. Ellis Price did not receive any benefit in the Sterbutzel case as a result of his participation in the Breakiron case.

15. Morrison, in his position as Acting District Attorney, met with Ellis Price prior to Breakiron's trial and expressly told him that he could provide him with no benefit in exchange for his testimony against Breakiron.

7

Id. at 21-23.

Although Breakiron did not prove that there was a deal, either express or implied, between Ellis Price and the prosecution or that the positive outcomes Ellis Price received in the Ricker/Pletcher case and the Sterbutzel investigation were the result of his participation in the Commonwealth's case against Breakiron, the Court held that Breakiron was entitled to relief on his Brady claim. Breakiron, No. 00-cv-300, 2008 WL 4412057 at *26-31. There was no dispute that the Commonwealth did not disclose the two letters that Ellis Price sent to the District Attorney. It also did not disclose that Ellis Price was a suspect in the Sterbutzel case both when he sent the letters and when he testified at Breakiron's trial. The Court held that that information had impeachment value because it showed that Ellis Price's initial motive to come forward with information against Breakiron was tied to his hope that he would receive benefits from the government. Id. at *27. The Court further held that the prosecution's failure to produce that information, along with the additional impeachment evidence that Ellis Price's Michigan conviction actually was assault with intent to rob (a *crimen falsi*), had a material impact on Breakiron's trial with respect to his conviction of first-degree murder. Id. at *28-32. Therefore, the Court concluded, Breakiron was entitled to a new trial,[2] but only with respect to his first-degree murder conviction. Id. at *21. Because the Court did not find that Ellis Price's testimony was relevant to Breakiron's robbery conviction, the Court concluded that Breakiron had not demonstrated that he was entitled to habeas relief as to that conviction. Id. at *51. The Court also denied Breakiron's petition in all other respects.

---

[2] Although a federal habeas court has the authority to order that a successful habeas petitioner be immediately released from an invalid conviction, conditional release orders are "[b]y far the most common habeas corpus remed[y] today[.]" R. Hertz & J. Liebman, FEDERAL HABEAS CORPUS PRACTICE AND PROCEDURE § 33.3. Such orders provide the state with a reasonable time period in which it may conduct a new trial before it must release the petitioner.

In his appeal, Breakiron contended that this Court erred in denying his request for habeas relief with respect to his robbery conviction. The United States Court of Appeals for the Third Circuit agreed with Breakiron and reversed this Court's judgment in part and ordered the case be remanded and that Breakiron be granted habeas relief as to his robbery conviction. Breakiron v. Horn, 642 F.3d 126, 131-57 (3d Cir. 2011).

In litigating his case here and before the Third Circuit Court, Breakiron maintained he was entitled to a new trial. He could have argued, as he does now, that the Brady violations that occurred in his case were so egregious that the result of his federal habeas case should be his immediate release with the instruction that he may not be retried. He did not do so. The Third Circuit Court concluded its 2011 decision by stating: "Although our review and opinion, as they must, focus on the procedural aspects of Breakiron's trial, three essential factors remain central and cannot be marginalized: a woman named Saundra Marie Martin is dead; money was stolen from the owner of "Shenanigan's"; *and Mark Breakiron must respond for the horrible sequence of events that occurred there.*" Id. at 147 (emphasis added).

In accordance with the Third Circuit Court's mandate, on May 17, 2011, this Court issued an order in which it granted Breakiron's petition as to both his conviction of first-degree murder and his conviction of robbery. The Court further ordered that the execution of the writ of habeas corpus be stayed for a specified period of time during which the Commonwealth may conduct a new trial. See Order, ECF No. 190 in Breakiron, No. 2:00-cv-300 (W.D. Pa. May 17, 2011).

As a result of this Court's order, Breakiron's criminal case returned to the Court of Common Pleas of Fayette County. The trial court appointed Samuel J. Davis, Esq., and Diane Zerega, Esq., to represent him. The prosecution has notified the defense that it will not utilize the testimony of Ellis Price.

9

Breakiron filed a pre-trial motion to dismiss the charges against him, arguing that the Brady violations found by this Court in the federal habeas case were so egregious that they created a double jeopardy bar to retrial. The trial court denied Breakiron's motion, holding "that the level of prosecutorial misconduct found by the Western District Court" did not warrant relief under the Double Jeopardy Clause. See Order in Commonwealth v. Breakiron, No. CP-26-CR-331-1987 (C.P. Fayette May 11, 2012), attached to Breakiron's Petition, ECF No. 3-3 at 53-54.

Breakiron, through counsel, filed an appeal with the Superior Court of Pennsylvania, which determined that it did not have jurisdiction over the appeal because Breakiron failed to follow the procedural requirements contained in the Pennsylvania Rules of Appellate Procedure. Commonwealth v. Breakiron, No. 1022 WDA 2012, slip op. at 11-15 (Pa.Super. Aug. 8, 2013), attached to Breakiron's Petition, ECF No. 3-3 at 55. After the Pennsylvania Supreme Court denied Breakiron's petition for allowance of appeal, he filed with this Court the instant pre-trial petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241. ECF Nos. 2 & 3. Respondents filed an Answer [ECF No. 10], to which Breakiron filed a Reply ECF No. 12.

## II. Discussion

Although "[f]or state prisoners, federal habeas corpus is substantially a *post-conviction* remedy" brought pursuant to 28 U.S.C. § 2254, Moore v. DeYoung, 515 F.2d 437, 441 (3d Cir. 1975), the more general habeas corpus statute of 28 U.S.C. § 2241 does provide federal courts with jurisdiction to issue a writ of habeas corpus before a state judgment is rendered, but only in very limited circumstances. Brian R. Means, Federal Habeas Manual § 9C:2 (2014), available at Westlaw FEDHABMAN. One of those circumstances is when a state defendant is arguing that his upcoming trial violates his rights under the Double Jeopardy Clause. See, e.g., Phillips v.

10

Court of Common Pleas, Hamilton County, Ohio, 668 F.3d 804 (6th Cir. 2012). Accordingly, this Court has jurisdiction over Breakiron's pre-trial petition for a writ of habeas corpus filed under 28 U.S.C. § 2241.

A state defendant seeking pre-trial federal habeas relief must first exhaust his claims in state court. Schandelmeier v. Cunningham, 819 F.2d 52, 53 (3d Cir. 1986); Moore, 515 F.2d at 442; Federal Habeas Manual § 9C:2. The exhaustion requirement is "grounded in principles of comity; in a federal system, the States should have the first opportunity to address and correct alleged violations of state prisoner's federal rights." Coleman v. Thompson, 501 U.S. 722, 731 (1991). See, e.g., O'Sullivan v. Boerckel, 526 U.S. 838, 842-49 (1999); Parker v. Kelchner, 429 F.3d 58, 61 (3d Cir. 2005) ("Exhaustion addresses federalism and comity concerns by affording the state courts a meaningful opportunity to consider allegations of legal error without interference from the federal judiciary.") (internal citations and quotations omitted). In order to exhaust a claim, "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's *established appellate review process*." O'Sullivan, 526 U.S. at 844-45 (emphasis added). See, e.g., Lambert v. Blackwell, 387 F.3d 210, 233-34 (3d Cir. 2004).

Like the exhaustion doctrine, the doctrine of procedural default is "grounded in concerns of comity and federalism[.]" Coleman, 501 U.S. at 730. It provides, in relevant part, that a claim for federal habeas relief may not be addressed by a federal court if the petitioner failed to comply with a state procedural rule when he presented that claim to the state court, and for that reason the state court declined to address the federal claim on the merits. See, e.g., Edwards v. Carpenter, 529 U.S. 446, 451 (2000); Wainwright v. Sykes, 433 U.S. 72 (1977); Lines v. Larkins, 208 F.3d 153, 162-69 (3d Cir. 2000).

11

Respondents argue that Breakiron has procedurally defaulted his federal habeas claims for the purposes of this § 2241 pre-trial habeas petition because the Superior Court determined that he did not file his appeal in accordance with the Pennsylvania Rules of Appellate Procedure and, therefore, it lacked jurisdiction to consider his claims on the merits. Breakiron provides no argument to counter Respondents' contention that his habeas claims are procedurally defaulted. Instead, he contends that his default should be excused because he can demonstrate "cause" for it and that he was "prejudiced." It is true that a petitioner whose habeas claim is procedurally defaulted can overcome the default, thereby allowing federal court review, if he can demonstrate "cause" for the default, *i.e.*, that some objective factor "external to the defense" impeded efforts to comply with the state's procedural rule, and "actual prejudice." See, e.g., Coleman, 501 U.S. at 750; see also Murray v. Carrier, 477 U.S. 478, 488, 494 (1986). The "cause" and "prejudice" exception, however, provides Breakiron with no avenue to overcome his default in this case. As "cause" for his default, Breakiron points to his trial counsel's error of failing to properly bring his appeal to the Superior Court. But negligence on the part of counsel does not qualify as "cause" "because the attorney is the prisoner's agent, and under 'well-settled principles of agency law,' the principal bears the risk of negligent conduct on the part of his agent." Maples v. Thomas, — U.S. — , 132 S.Ct. 912, 922 (2012) (citing Coleman, 501 U.S. at 753-54). Of course, an attorney's misconduct that is so severe that it fell below the constitutional standards of effective assistance of counsel as set forth in Strickland v. Washington, 466 U.S. 668 (1984) can establish "cause," but before a petitioner may rely upon it he typically must have first exhausted that claim of ineffective assistance with the state court. As the Supreme Court has explained:

> [W]e think that the exhaustion doctrine, which is "principally designed to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings," Rose v. Lundy, 455 U.S. 509, 518 (1982), *generally*

> *requires that a claim of ineffective assistance be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default....* [I]f a petitioner could raise his ineffective assistance claim for the first time on federal habeas in order to show cause for a procedural default, the federal habeas court would find itself in the anomalous position of adjudicating an unexhausted constitutional claim for which state court review might still be available. The principle of comity that underlies the exhaustion doctrine would be ill served by a rule that allowed a federal district court "to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation," Darr v. Burford, 339 U.S. 200, 204 (1950), and that holds true whether an ineffective assistance claim is asserted as cause for a procedural default or denominated as an independent ground for habeas relief.

Murray, 477 U.S. at 488-89 (emphasis added, parallel citations omitted).

Breakiron cannot litigate in state court a claim that his counsel was ineffective for failing to properly perfect his pre-trial appeal until, and in the event that he is, convicted and resentenced. He has not directed this Court to any authority that holds that because he must do so his procedural default should be excused for the purposes of pre-trial federal habeas review. Therefore, Breakiron's federal habeas claim is procedurally defaulted.

In the alternative, Breakiron's claims have no merit and are denied for that reason. The Supreme Court "has consistently held that the Double Jeopardy Clause imposes no limitation upon the power of the government to retry a defendant who has succeeded in persuading a court to set his conviction aside[.]" Oregon v. Kennedy, 456 U.S. 667, 676 n.6 (1982) (citing United States v. DiFrancesco, 449 U.S. 117, 130-31 (1980)). See also Lockhart v. Nelson, 488 U.S. 33, 38 (1988) (the Double Jeopardy Clause "does not prevent the government from retrying a defendant who succeeds in getting his first conviction set aside, through direct appeal or collateral attack, because of some error in the proceeding leading to conviction.") As the Supreme Court in Kennedy explained:

> The Double Jeopardy Clause of the Fifth Amendment protects a criminal defendant from repeated prosecutions for the same offense. United States v.

> Dinitz, 424 U.S. 600, 606, 96 S.Ct. 1075, 1079, 47 L.Ed.2d 267 (1976). As a part of this protection against multiple prosecutions, the Double Jeopardy Clause affords a criminal defendant a "valued right to have his trial completed by a particular tribunal." Wade v. Hunter, 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949). The Double Jeopardy Clause, however, does not offer a guarantee to the defendant that the State will vindicate its societal interest in the enforcement of the criminal laws in one proceeding. United States v. Jorn, 400 U.S. 470, 483-484, 91 S.Ct. 547, 556, 27 L.Ed.2d 543 (1971) (plurality opinion); Wade v. Hunter, 336 U.S., at 689, 69 S.Ct., at 837. If the law were otherwise, "the purpose of law to protect society from those guilty of crimes frequently would be frustrated by denying courts power to put the defendant to trial again." Ibid.

456 U.S. at 671-72.

The Supreme Court has recognized two exceptions to the rule set forth above: (1) when the conviction has been reversed because the insufficiency of the evidence, see, e.g., id. at 676 n.6; and (2) where a defendant in a criminal trial successfully moves for a mistrial, *and the conduct giving rise to the successful motion for a mistrial was intended to provoke the defendant into moving for a mistrial*, id. at 771-79.[3] Neither of these exceptions apply to Breakiron's case.

In Kennedy, the Supreme Court rejected the proposition that the Double Jeopardy Clause should bar retrial in every instance where prosecutorial overreaching occurs, holding instead that the circumstances under which a defendant may invoke the bar of double jeopardy in another effort to try him is limited to the second exception listed above. Id. The Supreme Court has not held that a defendant may invoke the bar of double jeopardy in a second effort to try him when his original judgment of sentence has been reversed because the prosecution violated its obligations under Brady, and the Third Circuit Court has rejected that argument. In United States v. Coleman, 862 F.2d 455 (3d Cir. 1988), the defendant contended that the government's failure

---

[3] In United States v. Oseni, 996 F.2d 186, 187-88 (7th Cir. 1993), the United States Court of Appeals for the Seventh Circuit cited Kennedy and explained: "The double jeopardy clause forbids the government to try a person twice for the same crime. If after a criminal trial begins the government decides that the case is going badly for it, it cannot dismiss the case and reprosecute the defendant. Nor is it permitted to achieve by indirection what it is not permitted to do directly; and thus it cannot engage in trial misconduct that is intended to and does precipitate a successful motion for mistrial by the defendant."

14

to provide him with Brady materials before his first trial barred his retrial under the Double Jeopardy Clause because a new trial "was insufficient to remedy the prosecutor's misconduct in failing to provide him exculpatory evidence in satisfaction of Brady." 862 F.2d at 457. In rejecting the defendant's argument, the Third Circuit Court explained:

> In the context of prosecutorial misconduct, the double jeopardy clause will not bar retrial "absent *intent* on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause." Oregon v. Kennedy, 456 U.S. 667, 676, 102 S.Ct. 2083, 2089, 72 L.Ed.2d 416 (1982) (emphasis added). Here, assuming arguendo a number of Brady violations prior to the first trial, the double jeopardy clause is not implicated. The prosecutor's withholding of exculpatory evidence from the defendant may only be characterized as an overzealous effort to gain a conviction from the first jury and not as an attempt to subvert Coleman's "valued right" by bringing the case before a second jury. Because the double jeopardy shield against prosecutorial misconduct seeks to deny "the prosecution a more favorable opportunity to convict" the defendant, Downum v. United States, 372 U.S. 734, 736, 83 S.Ct. 1033, 1034, 10 L.Ed.2d 100 (1963), we do not believe the clause may be invoked to supplement the remedies contemplated by Brady.
> - - -
> Careful scrutiny of Brady and its progeny lend further support to this approach. Brady itself addressed a prosecutor's failure, in a capital case, to disclose to a defendant a co-defendant's admission to commission of the actual homicide. In defining the due process right impinged by the prosecutor's failings, the Court noted that the aim of due process "is not punishment of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused." Brady, 373 U.S. at 87, 83 S.Ct. at 1197. See also Smith v. Phillips, 455 U.S. 209, 219, 102 S.Ct. 940, 947, 71 L.Ed.2d 78 (1982) (touchstone of Brady due process analysis is fairness of trial, not culpability of prosecutor). Unlike the double jeopardy analysis, which places a premium upon the defendant's right to one prosecution, due process simply requires that the defendant be treated fairly. The awarding of a new trial to remedy a Brady violation insures that the defendant will be able to make full use of the exculpatory evidence during the subsequent proceeding. Additionally, such a limited remedy furthers the societal interest in prosecuting criminal defendants to conclusion.

Id. at 457-59.

Respondents assert that under Kennedy and Coleman, Breakiron's claim that double jeopardy bars his retrial must fail. Breakiron provides no persuasive argument to counter to Respondents'. None of the cases relied upon by him persuade the Court that the circumstances

presented here preclude his retrial. He cites to several non-binding post-Kennedy and Coleman cases from other circuits *that discuss the possibility* that the reasoning of Kennedy may be extended beyond the mistrial context, but even in those cases the courts ultimately denied the defendant's argument that double jeopardy bars his retrial. For example, in United States v. Wallach, 979 F.2d 912 (2d Cir. 1992), a defendant raised a double jeopardy objection to retrial of his criminal case after the court of appeals had reversed his conviction on the ground that the prosecution should have known that a Government witness's trial testimony was false. The United States Court of Appeals for the Second Circuit held:

> Wallach reads Kennedy without the limitation of the mistrial context and extracts from it a rule of more general application: "The Supreme Court's rationale is that the Double Jeopardy Clause bars a second prosecution when the prosecutor engages in serious misconduct with the intention of preventing an acquittal."
> - - -
> [A]n extension of Kennedy beyond the mistrial context cannot be as broad as the rule for which Wallach contends. Every action of a prosecutor in the course of a trial is taken "with the intention of preventing an acquittal." See Kennedy, 456 U.S. at 674, 102 S.Ct. at 2088-89 ("Every act on the part of a rational prosecutor during a trial is designed to 'prejudice' the defendant by placing before the judge or jury evidence leading to a finding of his guilt."). If the rationale of Kennedy were as broad as claimed by Wallach, the Double Jeopardy Clause would bar retrial of every defendant whose conviction is reversed because of intentional misconduct on the part of a prosecutor. For example, knowing use of perjured testimony that "could have affected the judgment of the jury" would result not only in reversal of a conviction, see United States v. Agurs, 427 U.S. at 103, 96 S.Ct. at 2397-98; Napue v. Illinois, 360 U.S. 264, 272, 79 S.Ct. 1173, 1178-79, 3 L.Ed.2d 1217 (1959), but also in a bar to retrial on jeopardy grounds. The Supreme Court could not possibly have mandated that result in Kennedy. Such a result would obliterate the precise distinction drawn in Kennedy between misconduct that merely results in a mistrial and misconduct undertaken for the specific purpose of provoking a mistrial. Only the latter circumstance creates a bar to retrial.
> *If any extension of Kennedy beyond the mistrial context is warranted, it would be a bar to retrial only where the misconduct of the prosecutor is undertaken, not simply to prevent an acquittal, but to prevent an acquittal that the prosecutor believed at the time was likely to occur in the absence of his misconduct.*

16

Wallach, 979 F.2d at 916 (emphasis added). See also United States v. Catton, 130 F.3d 805 (7th Cir. 1997) (double jeopardy bar may exist where prosecution misconduct was "committed for the purpose of preventing an acquittal that, even if there was enough evidence to convict, was likely if the prosecutor refrained from misconduct," but Catton's case did not qualify for the protection); United States v. Gary, 74 F.3d 304, 314-15 (1st Cir. 1996) (recognizing Wallach but holding defendant could not meet its criteria).

The Court agrees with Respondents that none of the cases cited by Breakiron provide him with a basis for relief under the Due Process Clause. First, neither the Supreme Court nor the Third Circuit Court has held that Kennedy should be extended to other circumstances. Second, even if this Court were persuaded by the reasoning of the cases cited by Breakiron that discuss the possibility that Kennedy should be extended to bar a retrial where the misconduct of the prosecutor is undertaken *to prevent an acquittal that the prosecutor believed at the time was likely to occur in the absence of his misconduct*, Breakiron has not met that criteria. The Court rejects his contention that the prosecutors at his 1989 trial suppressed the Ellis Price impeachment materials because they wanted to prevent an acquittal or the imposition of a life sentence "*which appeared likely otherwise*." Petition, ECF No. 3, ¶ 23 (emphasis added). Neither the record in his federal habeas case at Breakiron v. Horn, No. 00-cv-300 (W.D. Pa.) nor the record in this case support such a finding. At most, the suppression of the Ellis Price impeachment evidence "may only be characterized as an overzealous effort to gain a conviction from the first jury and not as an attempt to subvert [Breakiron's] 'valued right' [to have his trial completed by a particular tribunal] by bringing the case before a second jury." Coleman, 862 F.2d at 457. See also Oseni, 996 F.2d at 188 (citing Kennedy for the proposition that for double jeopardy purposes, "[i]t doesn't even matter that [the prosecutor] knows he is acting improperly,

provided that his aim is to get a conviction. The only relevant intent is intent to terminate the trial, not intent to prevail at this trial by impermissible means."); Smith v. Coleman, 521 F.App'x 444, 449 (6th Cir. 2013) (misconduct motivated only by desire to convict is "irrelevant for double jeopardy purposes, see Oseni, 996 F.2d at 188, because the prosecutor is not attempting to vitiate 'the defendant's valued right to complete his trial before the first jury,' Kennedy, 456 U.S. at 673[.]").

Breakiron also argues that the prosecutors acted in bad faith and that their Brady violations amount to the type of "particularly egregious due process violations" that cannot be remedied by a new trial and, therefore, his retrial is barred under the Due Process Clause. See Government of Virgin Islands v. Fahie, 419 F.3d 249, 252 (3d Cir. 2005) ("While the [Supreme] Court has assumed that Brady violations that have affected the judgment of a jury normally will be remedied by a new trial, it has left open the possibility of barring retrial in response to particularly egregious due process violations."). This claim also has no merit. As Respondents point out, Breakiron has not cited to any case in which dismissal of charges was granted on due process grounds. Breakiron directs the Court to United States v. Fitzgerald, 615 F.Supp.2d 1156, 1162 (S.D. Cal. 2009), United States v. Lyons, 352 F.Supp.2d 1231, 1251-52 (M.D. Fla. 2004) and United States v. Dollar, 25 F.Supp.2d 1320, 1332 (N.D. Ala. 1998), but in his Reply he admits that in those cases the decision to bar the retrial was granted under the federal courts' supervisory authority over the United States Attorney's Offices in their districts. See ECF No. 12 at 10 n.4 ("The Fitzgerald, Lyons, and Dollars cases … were exercises of supervisory power and not, as the petition indicates, grants of relief under the Double Jeopardy or Due Process Clause.") The federal courts do not occupy the same supervisory role over the state entities involved in this prosecution. Finally, the factual findings made by this Court in his first federal habeas

18

proceeding do not support a finding of bad faith, and no argument that Breakiron makes in the instant petition convince the Court that Breakiron's is one of those extraordinarily rare cases in which the appropriate remedy for a Brady violation is the barring of a retrial for his 1987 murder of Saundra Marie Martin and for robbery.[4] Therefore, Breakiron's claim that the Due Process Clause prohibits his retrial is denied.

### III. Certificate of Appealability

28 U.S.C. § 2253 governs the issuance of a certificate of appealability for appellate review of a district court's disposition of a habeas petition. It provides that "[a] certificate of appealability may issue ... only if the applicant has made a substantial showing of the denial of a constitutional right." "When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a [certificate of appealability] should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."

---

[4] In support of his bad faith argument, Breakiron cites to another federal habeas case from Fayette County in which then-prosecutors Solomon and Warman were found to have committed Brady violations that were "staggering." Munchinski v. Wilson, 694 F.3d 308, 313 (3d Cir. 2012). Munchinski does not support a finding of bad faith in Breakiron's case. The Brady violations that occurred in Breakiron's case are not comparable to those that occurred in Munchinski, and the prosecutors involved in the Munchinski case were not the same ones that prosecuted Breakiron. The fact that both cases are from Fayette County and involved some of the same individuals in some aspect does not support the conclusion that Breakiron should receive the extraordinary relief of having his retrial barred as a result of Brady violations. In addition, despite the very troubling Brady violations that were found to have occurred in Munchinski, the remedy ordered in that federal habeas case was a new trial, not an outright dismissal of the case. Munchinski, 694 F.3d at 339 ("The Commonwealth must either release Munchinski or retry him within 120 days of our opinion.")
    Breakiron also cites to an incident in 2001 in which Ellis Price, according to police reports, fired warning shots into the air when he thought a group of teenagers were trespassing on his property and then pointed a gun at the driver of what he thought was their getaway car. Breakiron contends that the fact that criminal charges were not filed against Ellis Price at that time is additional circumstantial evidence of prosecution bad faith in his case. The Court rejects that argument as well. Breakiron does not establish that there was not a valid reason for the decision not to pursue charges against Ellis Price for the 2001 incident. And, in any event, the events surrounding that incident do not warrant the extraordinary remedy of barring his retrial for murder and robbery.

Slack v. McDaniel, 529 U.S. 473, 484 (2000). Where the district court has rejected a constitutional claim on its merits, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Id. Applying those standards here, jurists of reason would not find it debatable whether Breakiron's claims should be denied. Accordingly, a certificate of appealability is denied.

      An appropriate Order follows.

                                          s/Nora Barry Fischer
                                          Nora Barry Fischer
                                          United States District Court Judge
                                          Western District of Pennsylvania

Dated: February 3, 2015

cc: All counsel of record